IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MAURICE BELL,
      Petitioner,

vs.                             Case No.:  4:04cv505/MMP/EMT

JAMES V. CROSBY, JR.,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Doc. 1).  Respondent filed an answer, including relevant portions of the state court record (Docs. 10, 19).  Petitioner replied (Doc. 12).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D.Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that an evidentiary hearing is not required for disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND

Following a jury trial in the Circuit Court in and for Leon County, Florida, Petitioner was found guilty of robbery with a weapon (Doc. 10, Ex. A at 116; Doc. 19, Ex. V at 658).  On September 11, 2000, he was sentenced to thirty (30) years of incarceration (Doc. 10, Ex. A at 136-42).  Petitioner directly appealed his conviction and sentence (Doc. 10, Exs. D, E, F).  On April 19, 2002, the Florida First District Court of Appeal ("First DCA") affirmed the conviction and sentence

per curiam without opinion (Doc. 10, Ex. G).  Bell v. State, 814 So.2d 1029 (Fla. 1st DCA 2002) (Table).  The mandate issued May 7, 2002 (Doc. 10, Ex. H).

On July 29, 2002, Petitioner filed a motion for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure, which he amended on August 21, 2002 (Doc. 10, Exs. I, J).  The state court summarily denied three of the four grounds for relief (Doc. 10, Ex. K).  Following an evidentiary hearing on the fourth ground, the court denied relief on that ground as well (Doc. 10, Exs. L, M).  Petitioner appealed the decision, but the First DCA affirmed in a table opinion, with the mandate issuing October 19, 2004 (Doc. 10, Exs. P, Q, R, S, T).  Bell v. State, 883 So.2d 280 (Fla. 1st DCA 2004) (Table).

Petitioner filed the instant petition on December 12, 2004 (Doc. 1).  Respondent concedes that the petition is timely and that Petitioner exhausted his available state remedies (Doc. 10 at 4-6).

II.      STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

Section 2254 now provides:

(d)      An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
          (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
          (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[1]  The appropriate test in habeas cases was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412-13; Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding.  See Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343-45 (11th Cir. 2002).  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the

---

[1] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-375, 390-399, 120 S.Ct. at 1499-1503, 1511-1516); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and —except as to the footnote – Scalia) in part II (529 U.S. at 403-413, 120 S.Ct. at 1518-1523).  The opinion of Justice Stevens in Part II was joined by Souter, Ginsburg, and Breyer.

relevant Supreme Court precedent."  Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002) (quoting Williams, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404-06).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority."  Fugate, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  *Id.* (citing and quoting Williams, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'"  Bell v. Cone, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (quoting Williams, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by

a federal court produces a firm conviction that that [the state court] judgment is infected by constitutional error." Williams, 529 U.S. at 389.  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004) (citation omitted).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this Court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent.  Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n. 4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence."  Section 2254(e)(1); see Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." (dictum)); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); see also Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations).  Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. See Callahan v. Campbell, 427 F.3d 887, 926 (11th Cir. 2005 ) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) (concluding that "[petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record")).

Within this framework, the court will review Petitioner's claims.

III.    ANALYSIS

In the instant federal habeas petition, Petitioner raises the following four grounds for relief:

Ground one: Conviction obtained by the unconstitutional failure of prosecution to disclose favorable evidence to defendant.

Ground two: Ineffective assistance of counsel for failing to file a sufficient pre-trial motion to dismiss.

Ground three: Trial court erred in denying the motion for judgment of acquittal; State did not prove robbery.

Ground four: The lower court erred in imposing an upward departure sentence without making requisite findings.

As noted *supra*, Respondent concedes that Petitioner exhausted his claims in the state courts.

A.    Ground one: "Conviction obtained by the unconstitutional failure of prosecution to disclose favorable evidence to defendant."

Petitioner claims that the State failed to disclose the fact that the prosecutor promised Alexander Bell, one of Petitioner's co-defendants who testified against Petitioner at trial, a sentence of two years of probation in exchange for his testimony against Petitioner (Doc. 1 at 4, 2-A). Additionally, Petitioner alleges the prosecutor and Alexander Bell's attorney told Bell to answer in the negative when asked at trial about the alleged deal, because if he testified that a deal existed, the State's case would be disadvantaged (*id*. at 2-A). Petitioner claims that the State failed to correct Bell's allegedly false testimony that he was not promised anything in exchange for his testimony.

1.    Clearly Established Supreme Court Law

In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97. The State has an obligation to disclose all exculpatory evidence within its constructive knowledge, including "evidence known to others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

"Three elements establish a Brady violation: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish

prejudice." Stephens v. Hall, 407 F.3d 1195, 1203 (11th Cir.), *cert. denied* 126 S.Ct. 278 (2005) (citations omitted). The State's duty to disclose pertains only to evidence that is advantageous to the defense, including impeachment evidence, and which, if suppressed, would deprive him of a fair trial. United States v. Bagley, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); United States v. Newton, 44 F.3d 913, 918 (11th Cir. 1995). In showing that the non-disclosed evidence was material, Petitioner must demonstrate that there is a reasonable probability ("a probability sufficient to undermine confidence") that the result of the proceeding would have been different had the evidence been disclosed. Bagley, 473 U.S. at 682, 105 S. Ct. at 3383; *see also* Neeley v. Nagle, 138 F.3d 917, 926 (11th Cir. 1998). Petitioner need not demonstrate that, after discounting the inculpatory evidence in light of the evidence in question, there would not have been enough evidence to convict him; he need only show that the "'evidence [unavailable at trial] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Taylor v. Singletary, 122 F.3d 1390, 1395 (11th Cir. 1997) (quoting Kyles, 514 U.S. at 434-35).

> Suppressed impeachment evidence is 'material if the witness whose testimony is attacked supplied the only evidence linking the defendant to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.' However, suppressed impeachment evidence is not material where the new evidence merely constitutes 'an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'

United States v. Diaz, 176 F.3d 52 (2d Cir. 1999), *cert. denied sub nom*, Rivera v. United States, 120 S.Ct. 181 (1999) (quoting United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995)); *see also* Aldridge v. Dugger, 925 F.2d 1320, 1326 (11th Cir. 1991); United States v. Valera, 845 F.2d 923, 928 (11th Cir. 1988).

To succeed on a claim that the State presented false evidence, thereby violating his due process rights, Petitioner must establish that the prosecutor "'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony,' and that the falsehood was material." Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999), *cert. denied*, 531 U.S. 861, 121 S.Ct. 149, 148 L.Ed.2d 99 (2000) (quoting United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995)); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). For Giglio

purposes, "the falsehood is deemed to be material 'if there is any reasonable likelihood that the false testimony *could have* affected the judgment of the jury.'"  Alzate, 47 F.3d at 1110 (emphasis in original) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)).

2.      Federal Review of State Court Decision

Following an evidentiary hearing, the state court denied postconviction relief on this ground based upon the following factual findings:  (1) there was no credible evidence that a deal existed between Alexander Bell and the prosecution, and (2) there was no credible evidence that the prosecutor or Bell's counsel told Bell to lie about the existence of a deal in his testimony at Petitioner's trial (Doc. 10, Ex. L at 64, Ex. M).[2]

Although the state court decision did not contain a citation to the legal standard employed by the court in analyzing Petitioner's claim, the state court applied the correct legal rule, as reflected in the court's conclusion that the second prong of the Brady standard was not satisfied, specifically, there was no evidence of a deal between Alexander Bell and the State that was suppressed by the prosecution.

Furthermore, the state court decision was not an unreasonable application of Brady.  The state court found that Alexander Bell's testimony at the post-conviction hearing that he had been promised a deal of two years of probation in exchange for his testimony against Petitioner was not credible.  This factual finding is presumed correct unless Petitioner rebuts this presumption by clear and convincing evidence.  Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000).  Petitioner has failed to present such evidence; therefore, this court presumes that Bell's testimony was not credible.  At the post-conviction hearing in state court, Cheryl Gentry, Alexander Bell's trial counsel, testified that the prosecutor would not enter a plea agreement with Alexander Bell until all of the co-defendants had been sentenced (Doc. 10, Ex. L at 11-14).  Ms. Gentry testified that her client and the State reached a plea agreement, but after the co-defendants, including Petitioner, were sentenced,

---

[2]Although the state court opined as to whether evidence of a deal between Alexander Bell and the State would have affected the outcome of Petitioner's trial (Doc. 10, Ex. L at 65), this was merely dictum, as the state court specifically found as fact that there was no deal between Bell and the State.

and until that time, Gentry advised Bell that she expected he would receive a prison term as his sentence (*id.* at 14).  Gentry testified as follows:

> Q [by the State]:        Okay.  So, Mr Pointinger [the prosecutor], nor anyone on behalf of the State, ever represented to the defendant [Alexander Bell] at the trial against Maurice Bell, that he was going to receive any particular type of sentence, other than that would be something that would be considered once he was sentenced?
>
> A:        I told him [Alexander Bell] Mr. Pointinger was fair, and that if he testified that I trusted that there would be some level of consideration.  He had nothing to lose.  He was facing life.  I felt like they could put the case hard against him.  He was a major player, bad, serious history -- that anything was better than what he was facing.  He had no deal.  There was no plea agreement.  We got the agreement right before he was -- he entered plea and was sentenced. . . .
>         . . . But he wanted to try to have a life.  I think he was a very young man and I encouraged him to try to do this, but there was not any plea agreement.  There was nothing, other than we hoped anything other than life.
> . . . .
>         He and I had not done a wink and a nod of, oh, this is what you're going to get and we'll just have to get -- firm it up later.  There was nothing like that.  Mr. Pointinger and I had not had those conversations to even allow that to take place.  I told my client to expect prison and pray for not life.

(*id.* at 14-18).  Jack Pointinger, the prosecutor during Petitioner's trial, also testified at the post-conviction hearing.  He testified that there was never any deal made with Alexander Bell, and that Ms. Gentry's testimony was consistent with the events that actually occurred (*id.* at 27).

    The record is devoid of any evidence that Alexander Bell was promised anything by the State in exchange for his testimony at Petitioner's trial.  Because Petitioner failed to show that a deal existed between Bell and the State, the state court reasonably concluded that Petitioner failed to establish that the State suppressed evidence of a deal or knowingly permitted Bell to testify falsely that a deal did not exist.  Accordingly, Petitioner is not entitled to relief on this claim.[3]

_____

[3]To the extent Petitioner asserts an ineffective assistance of counsel claim based upon his counsel's failure to discover the existence of the deal between the prosecution and Alexander Bell (*see* Doc. 1 at 15-A; Doc. 12 at 8), Petitioner's claim is without merit, as Petitioner failed to establish that a deal existed.

B.      Ground two:  "Ineffective assistance of counsel for failing to file a
        sufficient pre-trial motion to dismiss."

Petitioner next claims he received ineffective assistance of counsel because his trial counsel
failed to file a sufficient pre-trial motion to dismiss the charge (Doc. 1 at 4).  Petitioner states his
counsel filed a motion to dismiss the charge on the ground that there was no evidence placing
Petitioner at the scene of the crime, but counsel should have argued that the evidence supported only
a charge of grand theft and not robbery with a weapon because none of the defendants said anything
to anyone in the store that was robbed, and a sledge hammer used by one of the co-defendants was
used only to open a glass display case containing the merchandise that was taken (*id*. at 4, 2-B).
Petitioner states he was prejudiced by counsel's failure because Petitioner was prevented from
raising this issue on direct appeal of his conviction (*id*. at 3-B).

1.      Clearly Established Supreme Court Law

The legal standard clearly established by the Supreme Court for ineffectiveness of counsel
claims is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984); Fugate, 261 F.3d at 1216-17; Wellington, 314 F.3d at 1260 (both citing Williams and
Strickland).  The two components of an ineffectiveness claim under Strickland are performance and
prejudice, and if an insufficient showing is made as to one, the court need not address the other.
Strickland, 466 U.S. at 697, 104 S.Ct. at 2069; Wellington, 314 F.3d at 1260.   In assessing
performance, the court considers whether "counsel made errors so serious that counsel was not
functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  466 U.S. at 686,
104 S.Ct. at 2064.  "The court must . . . determine whether, in light of all the circumstances, the
identified acts or omissions were outside the wide range of professionally competent assistance."
466 U.S. at 690, 104 S.Ct. at 2066.  Petitioner must show that "no competent counsel would have
taken the action that his counsel did take."  Fugate, 261 F.3d at 1217 (citation omitted).

Petitioner's burden of demonstrating prejudice is high.  Wellington, 314 F.3d at 1260.  The
Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some
conceivable effect on the outcome of the proceeding.'"  *Id.* (quoting Strickland, 466 U.S. at 693, 104
S.Ct. at 2067).  However, the Court has also clarified that a petitioner need not demonstrate it "more

likely than not," or prove by a preponderance of evidence, that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693-94, 104 S.Ct. at 2068.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694, 104 S.Ct. at 2068.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  Strickland, 466 U.S. at 694-95, 104 S.Ct. at 2068.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695, 104 S.Ct. at 2068-69.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

Id. at 695-96, 104 S.Ct. at 2069.

> 2.      Federal Review of State Court Decision

Petitioner raised this claim in his Rule 3.850 motion (Doc. 10, Ex. J).  The state court summarily denied Petitioner's claim on the ground that Petitioner failed to show he was prejudiced by counsel's alleged error (Doc. 10, Ex. K at 1-2).

The state court decision was not an unreasonable application of Strickland.   Under Strickland, Petitioner must show a reasonable probability that, had a motion to dismiss been made,

it would have been granted. Petitioner was charged with robbery with a deadly weapon (Doc. 10, Ex. A at 32-33). Rule 3.190 of the Florida Rules of Criminal Procedure provides that a motion to dismiss may be entertained on the ground that there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant. Fla. R. Crim. P. 3.190(c)(4). The rule requires that the motion specifically allege the facts on which it is based and must be sworn. Fla. R. Crim. P. 3.190(c). The court must deny the motion "if the state files a traverse that, with specificity, denies under oath the material facts or facts alleged in the motion to dismiss." Fla. R. Crim. P. 3.190(d). When considering a motion to dismiss, all inferences must be resolved against the defendant. State v. Booker, 529 So.2d 1239, 1239-40 (Fla. 1st DCA 1988) (citation omitted).

The elements of robbery with a deadly weapon are as follows:

1. The Defendant took the (money or property described in charge) from the person or custody of (person alleged).

2. Force, violence, assault, or putting in fear was used in the course of the taking.

3. The property taken was of some value.

4. The taking was with the intent to permanently or temporarily [deprive (victim) of [his] [her] right to the property or any benefit from it].

5. The Defendant carried a (deadly weapon described in charge) in the course of committing the robbery and the (deadly weapon described in charge) was a deadly weapon.

See Fla. Standard Jury Instructions in Criminal Cases § 15.1. The force element is further explained as follows:

The taking must be by the use of force or violence or by assault so as to overcome the resistance of the victim, or by putting the victim in fear so that the victim does not resist. The law does not require that the victim of robbery resist to any particular extent or that the victim offer any actual physical resistance if the circumstances are such that the victim is placed in fear of death or great bodily harm if he or she does resist. But unless prevented by fear there must be some resistance to make the taking one done by force or violence.

Florida Standard Jury Instructions in Criminal Cases, § 15.1. A "weapon" is defined as "any object that could be used to cause death or inflict serious bodily harm." Id. A weapon is a "deadly

weapon" if it is used or threatened to be used in a way likely to produce death or great bodily harm. *Id.*

The original and amended charging documents in this case alleged Petitioner unlawfully took Rolex watches of more than $20,000.00 in value from Lisa Malwitz at Carlyle & Company Jewelers and in the course of the taking used force, violence, assault, or putting in fear, and in the course of committing the robbery carried a deadly weapon, specifically, a sledge hammer (Doc. 10, Ex. A at 3, 16, 25). Petitioner admits that a prima facie case of grand theft existed (*see* Doc. 1 at 4, 2-B). Thus, he admits that he, as a principal, knowingly and unlawfully obtained the property of another with intent to permanently deprive the victim of her right to the property, and he admits that a sledgehammer was used during the course of the taking, but he contends that the undisputed facts fail to establish that force, violence, or "putting in fear" was used during the taking or that the sledgehammer was a deadly weapon.  Regardless of the fact that none of the defendants spoke to anyone in the jewelry store during the taking of the watches, a trier of fact could fairly and reasonably infer that the circumstances attendant to the robbery, namely, that the defendants used a sledgehammer to break a glass display case containing the watches in the presence of two employees of the jewelry store, were such as to ordinarily induce fear in the mind of a reasonable person, thereby establishing a prima facie case that "force, violence, assault, or putting in fear" was used in the course of the taking.  Likewise, a trier of fact could fairly and reasonably infer that the sledgehammer was used or threatened to be used in a way likely to produce death or great bodily harm, even if the sledgehammer was used only to break the glass case containing the watches. Therefore, Petitioner has failed to show a reasonable probability that the trial court would have granted a motion to dismiss if Petitioner's trial counsel had alleged the grounds suggested by Petitioner.  As Petitioner failed to satisfy the prejudice prong of the <u>Strickland</u> standard, the state court's denial of his claim was not contrary to or an unreasonable application of Supreme Court law.

      C.     <u>Ground three:  "Trial court erred in denying the motion for judgment of acquittal; State did not prove robbery."</u>

Petitioner claims that the trial court erred in denying the motion for judgment of acquittal (Doc. 1 at 2-c).  Petitioner concedes that the evidence was sufficient to support a conviction for

grand theft, but the evidence was insufficient to show that force, violence, assault, or "putting in fear" was used in the course of the theft and that a weapon was used (*id*.).

        1.     Clearly Established Supreme Court Law

To satisfy the constitutional requirement of due process in a criminal trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.  In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  When considering the sufficiency of the evidence on review, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319,  99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citation omitted); *see also* United States v. Thomas, 987 F.2d 697, 701 (11th Cir. 1993) (citations omitted); Bishop v. Kelso, 914 F.2d 1468, 1470 (11th Cir. 1990) (citation omitted).  The reviewing court will not reweigh the evidence, but should view it in the light most favorable to the prosecution.  Jackson, 443 U.S. at 319; Cosby v. Jones, 682 F.2d 1373, 1382 (11th Cir. 1982).  Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant.  Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987).  "It is only where, after viewing the evidence in its most favorable light and making all credibility decisions in favor of the state the evidence still fails to at least preponderate in favor of the state, that we become concerned with conflicting inferences."  Cosby, 682 F.2d at 1383 (footnote omitted).

        2.     Federal Review of State Court Decision

Petitioner presented this claim to the First DCA on direct appeal of his conviction, and the First DCA affirmed the conviction without issuing a written opinion.  Because the facts of the instant case and those of Winship and Jackson are not substantially the same, it cannot be said that the state appellate court's decision was "contrary to" clearly established federal law.  The question therefore becomes whether the state court unreasonably applied controlling Supreme Court law in denying Petitioner's claim.  Although the state appellate court's affirmance without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the

state court decision unless review of the record shows that decision to be unreasonable.  *See* <u>Helton v. Secretary for Dept. of Corrections</u>, 233 F.3d 1322, 1326-27 (11th Cir. 2000); <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000); <u>Hannon v. Cooper</u>, 109 F.3d 330, 335 (7th Cir. 1997).

The essential elements of the crime of robbery with a deadly weapon are set forth *supra*.  At Petitioner's trial, Ms. Lisa Malwitz, an employee of the jewelry store who was in the store at the time of the robbery testified as follows:

> I recall that I was standing up next to a counter that is in the middle of an island of jewelry cases, and I was making a notation on a notepad, and we have what's called an up system, and I was up.  It was my turn to wait on the next customer that entered the store.  And I recall hearing a lot of loud talking, male talking, and that they were coming into my area.  And I recall thinking, oh, they're coming into our store, and we have to greet each and every person.
>
> And so I recall looking up slightly and seeing someone in my peripheral version [sic] enter the store, and so I said, hello.  And then in my peripheral vision, again, each time someone entered the store, I said, hello, hello, hello, hello.  So I knew by the fact that I said that, that there were four individuals that had just entered.
>
> So I continued making whatever notation I was making.  And then as I looked up, because I sort of felt someone had stopped and was near me or behind me or had stopped, and I looked up and I came eyeball to eyeball with an individual that had a T-shirt over their face and some sort of hat on.  And I just sort of locked eyes with that person and my immediate thought was, this is not good.  This is what a robber would wear.  And so I turned to give a comment to my coworker, because I didn't -- you know, it could have been a prank for all I knew.  So I wanted to give notice, you know, like, hey, maybe you should come on over and help me.  But I didn't even get anything out of my mouth and I heard a tremendous crash.  And I said, hey, because that was my first reaction, was, like, hey, what are you doing?  But I, you know, kind of closed my eyes, because it was such a loud crash.  It was tremendous.  It sounded almost like a car coming through a plate glass window.
>
> And I said, hey, and then I thought, oh, gosh, hey, oh, my gosh, what's happening.  And I just started walking away from the counter.  And I heard a smash again, and I was very upset to recall that.  I'm sorry, but --
>
> . . . .
>
> It was very scary.
>
> . . . .
>
> But I realized that we were being robbed and it happened very quickly and very fast, but it was very frightening.  And, I mean, I didn't know what was going to happen next.  And it was sort of like, it's happening very fast, but sort of like time standing still.  And you think that whatever is happening could -- because you're there, you're there immediately next to this thing happening, that perhaps something could happen to you.

And so I went to the front of the store, to the very edge of the mall, and I knew I probably shouldn't leave the store, because that's sort of engrained [sic], that you cannot leave the store.  So Mr. Jim Booker, who is the manager of Zales, is then running across from his store to my area, and the fact that he did that, I thought, oh, my gosh, you know, something's going to happen to him.  And I just sort of waved him off like, no, no, no, don't come any closer.  And I was afraid that something was, indeed, going to happen to him.

And he stopped in the middle of the hallway, and he looked at them and he looked at me, and he said, hey, cut that out or something.  And then I guess they, whoever was in the store, ran away.  And I just sort of freaked out, I suppose is the best term for it.  And that's what I recall happening on that day.

Q [by the prosecutor].  Pretty unusual event, would you say?

A.      Yeah.

Q.      One you're not likely to forget any time soon?

A.      Unfortunately not.

Q.      Do you remember where Mr. Humbert was during the time this was going on?

A.      Mr. Humbert was on the other side of the store, I believe on the phone, and he just sort of froze.  I mean, I looked at him and I could see that he was on the phone, and I think he just stayed right there.

Q.      Did you ever hear him say anything to these persons or attempt to interfere with them in any way?

A.      No.

Q.      Did you attempt to interfere with them in any way?

A.      I think just saying, hey.  I mean, when it first happened, you just don't really think that's what's really happening, and that was my just -- no, I walked away as soon as I realized that, in that split second, what was probably really happening.  I just walked away to the front of the store.  I had on a jacket with keys -- pockets, and my keys -- your keys are always supposed to be on your person.  In fact, we get reprimanded if we leave them out on the counter or anything like that for any short period of time.  And they were in my pocket, and I put my hands in my pocket, because I thought, well, if someone asks me for my keys, I'm just going to hand it to them.

Q.      Now, why would you hand the keys to a person?

A.      As I said, the first day on the job, we are -- the whole day is about security and that your life is more important than anything for sale in the store, and that you should not resist and you should do whatever you are asked to by anyone who may ask you.

Q.      Now, the item that was used to strike the display case that you testified about, do you remember what that was?

A.      It was left behind.  It was what appeared to be a homemade sledgehammer.

Q.      Were you concerned about that item either being used as a weapon or against you or the store?

A.      Well, yes, sir.  I felt like what was going on at that moment was very frightening and that anything could happen at any moment to me or, you know, it was just very, very frightening.

Q.      Did the fact that a sledgehammer was being used to strike the display case, did that discourage you from taking any actions to prevent them from taking anything?

A.      Oh, yes, sir.  I wanted to get away from that area.  There was millions of shards of glass.  I mean, I just really thank God that nothing got in my eye or anything like that.  It was just a mess.

(Doc. 19, Ex. V at 79-83).

On cross-examination, Ms. Malwitz testified that she did not actually see either of the two strikes of the sledgehammer (*id*. at 95-96).  She first noticed the sledgehammer after the first strike because she heard the sound of breaking glass, and she did not see the second strike because she was walking away from the area (*id*.).  On re-direct, Malwitz testified that she would not have resisted the robbers even if the store did not have a "no-resistance" policy because the existence of the weapon generated fear in her (*id*. at 102-03).

Richard Humbert was the other employee working at the jewelry store at the time of the robbery.  He testified as follows:

Well, during the course of that business day, right about 12:00 o'clock, some individuals entered the store, and I was currently on the phone with a customer discussing a repair, and I heard the glass smash.

. . . .

Q [by the prosecutor].   And what did you see or hear when you were on the telephone?

A.       What I heard, which made me look, basically, was a commotion and then a very loud smashing of the case.  And I was speaking, facing the entrance as shown in Exhibit A, and I looked out of the corner of my eye and I could just see shadows and, you know, shapes.  I didn't look directly at them.  I could see that we were being robbed.

Q.       Okay.  Did you make any effort, sir, to get off the phone and proceed over there and tell them to stop or, perhaps, somehow resist their efforts to do --

A.       No, sir, I was afraid to even move.  I just froze.
. . . .
Q.       What prevented you for taking any action, sir?

A.       Well, as I said, I was afraid, first of all, mainly their next move, anticipating an act of violence that was displayed before me, with the force of breaking the glass, and not knowing what would come next . . . .

(Doc. 19, Ex. V at 113-19, 123).

Mary Hatfield, an employee of the Tallahassee Mall, testified that she was working in a customer service booth in the mall at the time of the robbery (*id*. at 146).  She stated she heard the sound of breaking glass and, upon looking at the jewelry store, saw a man with a sledgehammer break the glass of a jewelry case and swing the sledgehammer again (*id*. at 148-49).  She said she saw glass flying (*id*.).  Ms. Hatfield testified that she cowered behind the customer service booth and called 911 to report the robbery (*id*.).  She then saw four men exit the mall (*id*. at 150-51).

As noted *supra*, Petitioner concedes that the evidence was sufficient to support a grand theft charge, thereby admitting that the first, third, and fourth elements of robbery were established.  However, Petitioner contends the evidence was insufficient to show that force, violence, assault, or "putting in fear" was used in the course of the taking of the watches, and that a deadly weapon was carried in the course of committing the crime.  Plaintiff specifically argues that the fact that there was no evidence that any of the defendants spoke to anyone in the jewelry store negates the force, violence, assault, or "putting in fear" element.  Furthermore, he contends the fact that the sledgehammer was used only to break the glass display case and was not used in a threatening

manner; therefore, the evidence was insufficient to satisfy the "deadly weapon" element of the crime.

Despite the fact that none of the defendants spoke to the jewelry store employees, the remaining evidence included the following:  (1) Ms. Malwitz's testimony that immediately prior to the taking of the watches one of the defendants smashed the glass jewelry case with a sledgehammer, causing a tremendous crash that sounded like a car coming through a plate glass window and sending shards of glass flying, and then smashed the case again; (2) Ms. Malwitz's testimony that one of the robbers disguised himself with a T-shirt over his face and a hat, and that she was very frightened and felt that anything could happen to her; (3) Mr. Humbert's testimony that he was frozen with fear, and (4) Ms. Hatfield's testimony that she cowered behind a booth in the mall during the robbery.  This evidence, when viewed in the light most favorable to the State, permitted any rational trier of fact to find beyond a reasonable doubt that a reasonable person in the circumstances described would have felt in fear of great bodily harm if he or she had resisted the defendants actions.  Additionally, even if the sledgehammer was used only to break a glass jewelry case and was then dropped on the floor, any rational trier of fact could find beyond a reasonable doubt that the use of the sledgehammer, which created shards of flying glass, was used in a way likely to produce great bodily harm.  Thus, <u>any</u> rational trier of fact could have found the essential elements of robbery with a deadly weapon beyond a reasonable doubt.  Because Petitioner has failed to establish that the state court's denial of the motion for judgment of acquittal was unreasonable, he is not entitled to federal habeas relief on his claim.

      D.     <u>Ground four:  "The lower court erred in imposing an upward departure sentence without making requisite findings."</u>

Petitioner alleges the trial court imposed a thirty-year sentence based upon the fact that he had a long criminal record and could not be rehabilitated (Doc. 1 at 5).  Petitioner claims that his Sixth and Fourteenth Amendment rights were violated by that the fact that the judge, not the jury, made these factual determinations (<i>id</i>. at 5, 2-D).  Petitioner argues his sentence should be vacated, and he should be sentenced in accordance with <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); however, he concedes that the sentence imposed by the state court did not exceed the statutory maximum (Doc. 12 at 19).

1.      Clearly Established Supreme Court law

In Apprendi, the Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

2.      Federal Review of State Court Decision

Although Petitioner states he raised this claim on direct appeal of his conviction, the record shows that the only sentencing issue he raised was that the sentencing judge violated state law by imposing an upward departure sentence without making the requisite findings to support the statutory definition of the stated statutory reason for upward departure, and the sentencing court further violated state law by failing to file a written transcription of the court's oral pronouncement of sentence (Doc. 10, Ex. E at 17-21).  However, in the instant action, the state expressly waived Petitioner's failure to properly exhaust his Apprendi claim (*see* Doc. 10 at 6); therefore, this court must review the merits of the claim.

As noted *supra*, Petitioner expressly concedes that his sentence did not exceed the statutory maximum; therefore, the plain language of Apprendi precludes its application to this case. Additionally, to the extent Petitioner seeks federal review of the state law issues raised in his direct appeal, federal habeas relief is unavailable.  Federal habeas relief is available to correct only constitutional injury.  28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 479-80, 116 L.Ed.2d 385 (1991); Wainwright v. Goode, 464 U.S. 78, 83-84, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983).  Errors of state law which do not infringe upon a defendant's constitutional rights provide no basis for federal habeas corpus relief.  *See* Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1992) ("A state's interpretation of its own laws or rules provides no basis for federal habeas relief, since no question of a constitutional nature is involved.") (quoting Carrizales v. Wainwright, 699 F.2d 1053 (11th Cir. 1983)).  The law has been settled for some time in the Eleventh Circuit that federal courts may not review a state's alleged failure to adhere to its own sentencing procedures.  Branan v. Booth, 861 F.2d 1507, 1507-08 (11th Cir. 1988); Carrizales, 699 F.2d at 1054-55; Jones v. Estelle, 622 F.2d 124, 126 (5th Cir.), *cert. denied*, 449 U.S. 996 (1980);

Willeford v. Estelle, 538 F.2d 1194, 1196-97 (5th Cir. 1976).[4]  "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is couched in terms of equal protection and due process."  Branan, 861 F.2d at 1508 (citation omitted).  In the instant case, Plaintiff's claims that the sentencing court failed to make the requisite findings to support an upward departure and failed to file a written transcription of the court's oral pronouncement of sentence are purely matters of state law.  Therefore, federal habeas relief is unavailable.

For the foregoing reasons, it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED** with prejudice.

At Pensacola, Florida, this 5th day of January 2006.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.